UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| LAUREN IVISON, individually, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NEW ENGLAND CRYOGENIC )<br>CENTER, INC. )<br>)<br>)<br>Defendant. )<br>) | CIVIL ACTION NO. 23-11169 |


**PLAINTIFF'S ORIGINAL COMPLAINT
AND REQUEST FOR A JURY TRIAL**

**Table of Contents**

I.      PARTIES .................................................................................................... **2**

II.     JURISDICTION AND VENUE ................................................................ **3**

III.    NATURE OF THE CASE ......................................................................... **3**

IV.     FACTUAL ALLEGATIONS .................................................................... **4**

    A.   **Egg Retrieval** ..................................................................................... **4**

    B.   **Egg Storage and Transport** ................................................................ **8**

    C.   **Egg Transfer and Thawing** ............................................................. **12**

    D.   **The Process Irreparably Breaks Down.** .......................................... **13**

    E.   **The Egg-Freezing Industry** ............................................................ **16**

V.      FIRST CAUSE OF ACTION - NEGLIGENCE ..................................... **18**

VI.     SECOND CAUSE OF ACTION - FRAUD AND DECEIT ................... **19**

VII.    THIRD CAUSE OF ACTION - GROSS NEGLIGENCE ..................... **21**

VIII.   FOURTH CAUSE OF ACTION - BREACH OF CONTRACT ............... **23**

IX.     FIFTH CAUSE OF ACTION - BREACH OF CONTRACT (THIRD PARTY BENEFICIARY) ....................................................................................... **24**

X.      SIXTH CAUSE OF ACTION - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ........................................................................ **25**

XI.     DAMAGES ............................................................................................ **25**

XII.    DEMAND FOR JURY TRIAL ............................................................. **26**

XIII.   PRAYER ................................................................................................ **26**

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:**

Plaintiff Lauren Ivison (Lauren), by and through the undersigned counsel, brings this Complaint against Defendant New England Cryogenic Center, Inc., 500 Donald Lynch Blvd, Marlborough, MA 01752-4716 (NECC), and alleges as follows:

I.      **PARTIES**

1.      Plaintiff is over the age of eighteen and resident and citizen of Colorado.

2.      Defendant New England Cryogenic Center, Inc. is incorporated in Massachusetts with its principal place of business at 500 Donald J. Lynch Boulevard, Marlborough, MA 01752.


## II.      JURISDICTION AND VENUE

3.      The Court has original subject matter jurisdiction over this civil action as it is between citizens of different states and the amount in controversy exceeds $75,000, as required under 28 U.S.C. §1332.

4.      Venue is properly established in this Court pursuant to 28 U.S.C. §1391 as this is the judicial district in which Defendant NECC resides and where it is subject to the court's personal jurisdiction.


## III.      NATURE OF THE CASE

5.      This is an action for damages suffered by Plaintiff as a direct and proximate result of NECC'Ss negligence, fraud, deceit and wrongful conduct in connection with the marketing, advertising, sale, and provision of services relating to its cryomanagement and cryogenic transport and storage of human female oocytes (eggs) for in vitro fertilization (IVF).[1]

6.      Unbeknownst to Plaintiff, NECC operates without material oversight or regulation which allows it to bypass basic standards for the management, transport, and storage of cryogenically preserved living human tissue.

7.      NECC's conduct, as alleged in more detail below, was and is against public policy.

---

[1] In vitro fertilization is process of fertilization where an egg is combined with sperm outside the body, in vitro.

8.      Plaintiff's injuries were avoidable, and she brings this action on her behalf for her damages, but also to prevent others from experiencing the same fate.


## IV.      FACTUAL ALLEGATIONS

### A.  Egg Retrieval

9.      Lauren Ivison always wanted to have children. But at the age of 38, when Lauren had not yet conceived, she began to worry about time.

10.      As the clock ticked down, Lauren began researching her options, options that would preserve one of the most crucial decisions of her life.

11.      Lauren thoroughly researched the leading experts in egg freezing.

12.      Through their website, Lauren located Extend Fertility in New York City (Extend).

13.      Lauren intended to use Extend to freeze and preserve her eggs, and then to transport her eggs to Colorado for thawing and IVF.

14.      In late September 2018, Lauren flew to New York City to begin the egg retrieval process at Extend's offices.

15.       The egg retrieval protocol began on September 28 and lasted until October 12, a long, two-week process.

16.      On October 12, 2018, at the age of 39, Lauren underwent a successful egg retrieval and the doctor noted he had cryopreserved one "Big oocyte."

17.       On January 12, 2019, Lauren once again returned to New York from Colorado to undergo a second egg retrieval, a process that again took two weeks.  This time, on January 25, 2019, Dr. Klein retrieved and cryopreserved two mature eggs.

18.     The Extend laboratory uses a Cryotec straw in the vitrification process. The Cryotec is a thin film strip attached to a rigid plastic handle. Extend stored Lauren's mature eggs, or oocytes on the film on the end of the Cryotec.[2]



*This is a photograph of the Cryotec wand.*



*This photo identifies the blue plastic Cryotec handle (or straw) sitting in the tray of the vitrification plate which has three processing wells. On the far-right end of the Cryotec is a film or sheet upon which the oocytes are placed for vitrification.*

---

[2]YOUTUBE,          Protocol2020          English,          *available          at* https://www.youtube.com/watch?time_continue=135&v=XEy9zCKBRnU&feature=emb_logo (last visited Feb. 19, 2023).



*This photo identifies a close-up of the film on the end the Cryotec, and a pipette dropping an oocyte or embryo onto the film.*

19.    After the oocytes are placed on the Cryotec, the technician submerges the film into

liquid nitrogen, vitrifying the oocytes onto the film.



20.    The technician then manually screws a cap over the film on the end of the Cryotec

straw.



21.    The lab technician places the Cryotec into a goblet, a plastic tube that holds

multiple Cryotec straws. The goblet is then attached to long metal holder known as a cane.



*The cane, the straws and the goblet.*



*In this photo, the goblet is blue.*

22.     The cane is stored in a canister which is kept in a liquid nitrogen tank.



*In this photo, the technician is transferring the cane to the canister that fits inside the tank.*

23.     Extend keeps liquid nitrogen tanks containing the frozen oocytes in their lab, until they decide to transfer the frozen oocytes to Defendant NECC, their long-term storage facility partner.



*This photo shows actual liquid nitrogen storage tanks kept under a desk in Extend's lab.*

### B.  Egg Storage and Transport

24.     In March of 2019, Lauren received an email from Extend notifying her that her retrieved eggs had been transferred from Extend's New York facilities, to their long-term storage facility at NECC in Massachusetts. The notice she received indicated: "*We are reaching out to you to notify you that your eggs are now being stored safely at Extend Fertility's long-term storage facility managed by New England Cryogenic Center, Inc. Your eggs are well cared for and protected by our state-of-the-art, FDA-registered storage facility.*"

25.     On its website, with the explicit recognition that "*a highly monitored, secure storage facility is imperative,*" as a part of the egg preservation process, Extend represents: "*That's why we've partnered with **industry leaders** in human tissue storage, New England Cryogenic Center in Massachusetts, for the long-term storage of eggs frozen at Extend Fertility.*"[3]

---

[3] EXTEND FERTILITY, Keeping Your Frozen Eggs Safe, *available at* https://extendfertility.com/keeping-your-frozen-eggs-safe/ (emphasis added) (last visited May 23, 2023).

26.     Extend did not make long-term storage at NECC's facility a choice but operated in concert with NECC and established NECC as its long-term storage partner.

27.     Extend is solely responsible for the selection of NECC and partnership with the company in the egg transport and long-term storage.

28.     Extend represents this is because: "*We chose this transportation method for all eggs frozen with Extend Fertility because we have full trust in NECC team; NECC has sent and received over 100,000 shipments in the last 20 years, without incident.*"[4]

29.     Regarding its relationship with providers like Extend, NECC says, "*NECC serves as a valuable resource, allowing medical and research facilities to outsource storage of sperm, embryos, stem cells, bone marrow and other cells and tissue. Our success in processing and transporting cryopreserved specimens has led to services dedicated to long-term storage*."[5]

30.     NECC claims to have a "*highly trained staff*," that uses "*the most advanced technology.*"[6]

31.     NECC's website goes on to state, "*We understand the importance of the materials we store and ship. We have invested heavily in our state-of-the-art storage facility and in our cryogenic shipping technology. We offer you the highest quality services in both cryogenic shipping and storage for sperm, eggs, and embryos.*"[7]

32.     Similarly, per Extend's website, NECC is "*one of the largest cryogenics storage sites in the world. Cryogenic storage is their **sole** focus and specialty, and they've been storing*

---

[4] *Id.* (emphasis added).

[5] NECRYOGENIC, Home Page, available at https://www.necryogenic.com (emphasis added) (last visited May 24, 2023).

[6] *Id*. (emphasis added).

[7] *Id; see also* NECRYOGENIC, Shipping Storage, *available at* https://www.necryogenic.com/shipping-storage/ (emphasis added) (last visited May 24, 2023).

*human tissues, including eggs and embryos, from all over the world for over 40 years without a single failure of any kind*."[8]

33.     NECC is aware of and authorizes the representations Extend makes on its website and to clients regarding NECC's services.

34.     NECC and Extend further represent and describe NECC's process for egg storage, which includes (1) automatic temperature maintenance, (2) constant monitoring, and (3) no susceptibility to power outages.[9]

35.     NECC also states, "*with more than 385,000 samples stored in our facility, New England Cryogenic Center is a world leader in the cryogenic storage of human cells and tissue.*"[10]

36.     Extend guarantees that NECC is "*highly regulated*" as it is "*registered and governed by the FDA, licensed with appropriate regulatory agencies, and is regularly inspected by several entities. Their equipment, protocols, and standards exceed all federal and state regulations. Bottom line: NECC uses a highly tested, fail-safe inventory and storage system, and standards, which is why we have full trust in the safety and security of all frozen eggs stored there.*"[11]

37.     NECC also transports all frozen eggs for Extend clients. "*NECC brings specialized travel tanks called "cryomovers" to Extend Fertility, fills them, and then takes the filled tanks to*

---

[8] EXTEND FERTILITY, Keeping Your Frozen Eggs Safe, *supra* note 3 (emphasis added).

[9] *Id*; NECRYOGENIC, Shipping Storage, *supra* note 6 (emphasis added).

[10] *Id*. (emphasis added).

[11] *Id.* NECC has a License from the Department of Health in MA under General Laws, Chapter 111D. NECC also has licenses from the New York State Department of Health as a Tissue Bank for Semen, testicular biopsies and epididymal aspirates, and oocytes and embryos.

*their facility.*"   Once at NECC, "*the specimens are moved into large tanks following strict protocols. Only highly trained cryogenic professionals are involved in the process.*"[12]

38.    NECC represents their shipping services as follows: "*one of the world's leading cryogenic shipping specialists. Each year, thousands of clients and medical professionals turn to New England Cryogenic Center to transfer cryogenically preserved material such as embryos, banked sperm, stem cells or other tissue from one location to another. Whether shipping across town or around the world, you can rely on New England Cryogenic Center's experience and our well-earned reputation for security, reliability and success. Cryogenic shipping is quite safe and secure.*"[13]

39.    Plaintiff believes the relationship between Extend and NECC is governed by contract, and further that the contract in place is intended by the parties to benefit third parties using their services—like Lauren—by providing long-term storage and transportation services.



*This photo is from NECC'Ss website: https://www.necryogenic.com/shipping-storage/*

---

[12] EXTEND FERTILITY, Keeping Your Frozen Eggs Safe, *supra* note 3 (emphasis added).

[13] NECRYOGENIC, Shipping Storage, *supra* note 6 (emphasis added).

40.     Extend acted as an agent of NECC during all relevant times.

41.     Lauren paid Extend for long-term storage of her eggs at NECC with the Spring 2019 Long-Term Storage Plan Renewal Form via credit card on May 8, 2019.

42.     Believing her eggs safely retrieved and preserved, time was now on Lauren's side.

**C. Egg Transfer and Thawing**

43.     When Lauren determined it was the right time for her to begin her family, she began to research fertility specialists in Colorado.  Performing her due diligence, Lauren identified the local Colorado fertility specialist for her IVF process. Conceptions Reproductive Associates, Inc. in Colorado (Conceptions) formed in 1986, advertised its practice as having "*the honor of being among the highest successful birth rate both state- and nation-wide*."[14]

44.     In January of 2020, Lauren began seeing Dr. Greene at Conceptions to make plans for In-vitro fertilization (IVF). Conceptions' providers were advertised as "*some of the finest reproductive experts in the nations*."[15]

45.     Lauren then contacted Extend and advised them she would be requesting the transfer of her eggs to Conceptions in Colorado for thawing and IVF.

46.     Dr. Robert A. Green at Conceptions advised Lauren that Conceptions had worked through the interstate transfer process and confirmed all the necessary procedures and details: "*I met with lead embryologist Glenn Proctor today. We reviewed your case in detail. He has*

---

[14] WFMZ.COM, *Conceptions Reproductive Associates of Colorado Announces Partnership with Automated Cell Management Platform TMRW* (Apr. 29, 2021), *available at* https://www.wfmz.com/news/pr_newswire/pr_newswire_business/conceptions-reproductive-associates-of-colorado-announces-partnership-with-automated-cell-management-platform-tmrw/article_ee29b548-7eb2-546e-bfed-91a90b37e470.html (last visited May 23, 2023).

[15] CONCEPTIONS, Providers, *available at* https://www.conceptionsrepro.com/fertility-doctors.html (emphasis added) (last visited Feb. 19, 2023).

*investigated Extend Fertility and agreed that we can accept your frozen oocytes as part of greater treatment plan*."

47.     At no point in time did Extend or NECC advise Lauren there was a problem with the quality of her eggs.  Extend and NECC did not warn Lauren that by transferring her eggs to Conceptions, there was an increased risk of any type in the process.

48.     Instead, Extend merely advised Lauren that she also had the option to go through IVF at Extend. Lauren received a response on February 28, 2020, from Jen Bernier, Director of Client Services (Bernier) who advised her that "*First I did want to ensure you know you can use your eggs with Extend! I forgot to mention that when we spoke on the phone*!"

49.      Lauren, however, preferred to go through the IVF process near her home.

50.     Extend sent Lauren a form and charged her for transporting her eggs to Conceptions in Colorado. Extend advised Lauren they would "*work together*" with Conceptions to ensure the safe transfer of her eggs (to be done by NECC).

51.     Bernier provided Lauren with a transfer-out consent form, specifically advising her to check: "*ALL oocytes*," as well as advising her the cost would be $450. "*Once we have all your documents and your center you are working with is ready to accept the eggs we all work together with NECC to arrange the transfer*."

52.     Lauren sent payment for the transfer of her three oocytes on March 4, 2020, by credit card to Extend. Lauren completed all the transfer and payment documents with Extend.

### D.  The Process Irreparably Breaks Down.

53.     During the week of March 16, 2020, Lauren received a disturbing phone call from Conceptions.  They advised her Extend/NECC had only sent one of the straws which was identified as containing just one egg.

54.     After this phone call, Lauren immediately contacted Extend. She was advised that one of her two Cryotec straws had been misplaced.

55.     Extend then advised Lauren they had found the second straw at their New York facility. She was advised: "*We apologize for this! One straw was at Extend and the other was at NECC. Again our apologies.*"

56.     Extend agreed to send the second straw from the January 2019 retrieval to Conceptions.

57.     Extend then told Lauren they shipped the second straw (through NECC) to Conceptions for delivery on April 9, 2020.

58.     At no point did Extend or NECC advise Lauren that there were any issues or problems with the oocytes, the straw containing the oocytes, or the viability of the oocytes.

59.     On April 9, 2020, Conceptions received the shipment of the second straw. Conceptions confirmed receipt of the shipment but did not advise Lauren of any problems with the shipment.

60.     Conceptions would later indicate that one of the straws was missing its top.

61.     Upon information and belief, Conceptions delayed the thaw and fertilization due to the Pandemic.[16] Conceptions scheduled the thaw and fertilization procedure for May 28, 2020.

62.     The next call Lauren received changed her life forever.  On May 28, 2020, the Conceptions embryologist, Dr. Kim La Rocque, informed Lauren she had no useable oocytes.

---

[16] New York's stay-at-home order was issued March 22, 2020.  Colorado's stay-at-home order was issued March 26, 2020.

63.     La Rocque advised Lauren that "*the tops to one of the straws was missing*."  She also told Lauren, of the three expected oocytes two "*weren't there*."  And the third oocyte had degenerated and not survived the thaw.

64.     Upon information and belief, La Rocque used the same thaw methodology for the thawing process as she had used at another clinic for 13 years. She said she "*was very familiar with it. She has no idea what happened. She said they just weren't there*."

65.     According to Lauren's medical records from Conceptions recorded by K. LaRocque: "*The first cryotop[17] was labeled to contain 1 oocyte. Nothing was present on this cryotop. Second embryologist searched dish. The second cryotop was labeled to contain 2 oocytes. There was one oocyte on this cryotop. Second embryologist searched dish. Unfortunately, this oocyte did not survive the warming process*."

66.     Lauren had no viable oocytes for IVF. She also had no explanation as to why two of her three oocytes were missing.

67.     Egg retrieval is a demanding process for a woman.  Lauren put her full faith and trust in NECC to live up to the representations made concerning their services.  She relied on them for their expertise and on their claims to superior results.  Lauren's eggs were lost due to causes that have not been explained. These losses will always weigh on Lauren's mind.  It's impossible for Lauren to forget that a part of her was lost, along with an opportunity to carry and give birth to her own biological child. Lauren does not want anyone else to experience what she has gone through.

---

[17] Cryotop is a tradename for another type of vitrification straw (also a plastic wand with a flat blade) manufactured by Kitizato in Japan.  The Cryotec vitrification straw is a tradename of Cryoteclabs developed by Dr. Masashige Kuwayama in 2011. Kuwayama also appears to have developed the Cryotop method in 2000. https://www.emedevents.com/speaker-profile/masashige-kuwayama

68.     The loss of Lauren's oocytes has caused her substantial physical and emotional pain, distress, and suffering.

69.     As a result of the emotional distress caused by this ordeal, Lauren and her partner ended their relationship.

70.     In addition to these losses, Lauren has spent significant funds in an effort to achieve a pregnancy. Extend advertises its costs as $6,500 for the first cycle and $5,500 for additional cycles.[18] Her out-of-pocket expenditures also included medications, travel and hotels and lost time at work. She also incurred expenses for the services at Conceptions, including the unsuccessful thaw.

71.     Following the unsuccessful thaw, Lauren incurred additional expenses to become pregnant through the use of a donor egg.

### E.  The Egg-Freezing Industry

72.     The egg freezing industry (including retrieval, storage, and transport) has emerged as a multi-billion-dollar industry. The industry has experienced staggering financial growth with large infusions of venture capital money. Yet, required industry-wide cryomanagement accountability and control practices have not been implemented to manage this growth. Although the facilities are handling invaluable human cells, most of the industry uses antiquated manual labeling, identification, record keeping and tracking systems. The industry remains virtually unregulated, putting women, families, and the public at risk.

73.     Based upon information and belief, Extend was founded in 2016, funded by private equity funds to build a syndicate of fertility clinics. Extend spins its story as "*founded on the*

---

[18] EXTEND FERTILITY, Pricing, *available at* https://extendfertility.com/pricing/ (emphasis added) (last visited Feb. 19, 2023).

*premise that democratizing egg freezing could ultimately change the fertility industry.*" In truth, the intent appears to be the monetization of women's fertility.

74.     Extend's pitch is "*disrupting the way fertility treatment has traditionally been provided.*"  This means the expansion of their egg freezing model to additional geographic markets.

75.     NECC offers to provide "*trouble-free opportunities for clients to preserve their own fertility for the future.*"

76.     These facilities are encouraging women to freeze their eggs, not out of medical necessity, but simply as a matter of convenience, and assuring their clients of their security in the process.

77.     Cryopreservation—and all of the repeated manual steps after retrieval to IVF— virtually guarantees human error. Variation within the procedures and between technicians, labs and programs also means there is an inherent lack of reliability and accountability. There are no cameras, no recordings, and virtually no paperwork.

78.     When Lauren requested all documentation from her egg storage at NECC, the facility responded they had <u>no records</u>.

79.     After retrieval, a woman has no means of tracking or identifying her own eggs.

80.     Extend uses novel thin-film, supercooling procedures in an open-system utilizing a plastic wand with a flat blade device called a Cryotec. Yet, open-blade methods are subject to technical variation and expose the system to flaws and human error that present quality control issues and the opportunity for failure.

81.     Storage and transfer of the open blade Cryotec has been reported to create the added risk of failure.

82.     Yet, Extend is relying on marketing that touts virtually a 100% success rate, declaring:



83.     While cryomanagement is expanding, cryomanagement practices have not evolved to keep up with this growth. Technology, record keeping, management and oversight has not been standardized, regulated, or required. Errors are likely to continue unless the industry is held responsible and NECC, in this case, accountable.[19]

## V.     FIRST CAUSE OF ACTION - NEGLIGENCE

84.     Plaintiff re-alleges each and every allegation of this Complaint.

85.     NECC had a duty to the Plaintiff to exercise reasonable care in its representations, marketing, supply, sale, and provision of its products and services; Defendant breached this duty, and the breach of that duty constituted a proximate cause of Plaintiff's injuries.

86.     NECC'S negligence included, but was not limited to, the following:

a)  Failing to safeguard Lauren Ivison's frozen eggs.

b)  Failing to properly label and store Lauren Ivison's frozen eggs.

c)  Failing to implement strict safe and secure cryomanagement practices for the preservation of frozen eggs.

b)  Failing to implement and follow strict safe and secure practices and protocols for handling and transporting frozen eggs.

---

[19] Plaintiff is also bringing a lawsuit against Extend in the United States District Court for the Southern District of New York.

c) Failing to ensure the secure transportation of frozen eggs from their facility to another facility under conditions and oversight that protected the viability of the frozen eggs.

d) Failing to provide for a system of identification to preserve the chain-of-custody of frozen eggs.

e) Failing to provide for a system to transport the oocytes from Extend to NECC and NECC/Extend to Conceptions, ensuring the necessary precautions were taken so that the oocytes would be property preserved.

f) Failing to promulgate rules and procedures for the proper handling and labeling of frozen eggs.

g) Relying on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

h) Failing to implement software and hardware technology to store, trace and maintain frozen eggs.

i) Failing to ensure that frozen eggs are only transferred to trained and qualified labs who can thaw eggs from NECC/Extend pursuant to the requisite specialized procedures.

j) Failing to warn Lauren of the dangers inherent in egg transport.

k) Misrepresenting the success rate of frozen egg survivability.

l) Misrepresenting and falsely advertising the nature and quality of NECC's services and the terms and conditions on which services are performed.

m) Generally using unreasonable, careless, and negligent conduct in the sale and performance of its storage and transportation services.

87.    As a direct and proximate result of the unreasonable, careless and negligent conduct of NECC as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

88.    Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

## VI.    SECOND CAUSE OF ACTION - FRAUD AND DECEIT

89.    Plaintiff re-alleges each and every allegation of this Complaint.

90.    NECC and Extend (acting on behalf of and with approval of NECC and/or as NECC's agent) misrepresented their practices and protocols for handling living cells. Through these actions, Extend and NECC fraudulently induced Lauren into entering into a contractual relationship by misrepresenting their services.

91.    NECC, both on its own and by way of Extend, knowingly made false and fraudulent statements of material fact concerning the nature and quality of their services and the terms and conditions on which these services were performed. NECC intended to induce Plaintiff, as well the general public, to rely on these statements and misrepresentations; Plaintiff's reliance on these statements and misrepresentations was justifiable and NECC is liable for the harm and damage caused to Plaintiff.

92.    NECC'S false and fraudulent statements or omissions of material fact, as fully identified above in the factual allegations, included, but were not limited to, the following:

a)  Falsely representing NECC'S ability to safeguard Lauren Ivison's frozen eggs.

b)  Falsely representing NECC'S cryomanagement services for the preservation and use of frozen eggs.

c)  Falsely representing NECC'S cryomanagement services for handling and transport of frozen eggs.

d)  Falsely representing NECC'S maintained a secure system of identification to preserve the chain-of-custody of frozen eggs.

e)  Falsely representing NECC'S services included providing for a safe system to transport the oocytes from Extend to NECC and then to another lab that ensured the necessary precautions were taken so that the oocytes would be property preserved.

f)  Falsely representing NECC maintained precautions necessary to ensure Lauren's frozen eggs were preserved during transport to NECC and later to Conceptions.

g)  Falsely representing success and survivability rates for frozen eggs.

h)  Falsely representing the success rate of the Cryotec vitrification process.

i)  Falsely representing NECC operated under rules and procedures for the proper handling and labeling of frozen eggs.

j)  Falsely representing frozen eggs could be safely and securely transported to another laboratory for thawing.

k)  Falsely representing that NECC could safely and securely transport Plaintiff's frozen eggs to Colorado for thawing.

l)  Failing to disclose the material fact that NECC relied on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

m)  Failing to disclose the material fact that NECC had not implemented software and hardware technology to store, trace and maintain frozen eggs.

n)  Failing to disclose to Plaintiff the material fact that it could only transfer her frozen eggs to trained and qualified laboratories that were trained in de-vitrification or thawing eggs pursuant to Cryotec's thawing process.

o)  Misrepresenting and falsely advertising the nature and quality of NECC'S services and the terms and conditions on which services are performed.

p)  Failing to warn Lauren of the dangers of egg transport.

93.    As a direct and proximate result of the carelessness and negligence of NECC as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

94.    Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

## VII.    THIRD CAUSE OF ACTION - GROSS NEGLIGENCE

95.    Plaintiff re-alleges each and every allegation of this Complaint.

96.    NECC had a duty to the Plaintiff to exercise reasonable care in their representations, marketing, supply, sale, and provision of its products and services. NECC breached this duty, and the breach of that duty constituted a proximate cause of Plaintiff's injuries.

97.    NECC's breach of duty was more than a mere failure to exercise reasonable care. It amounts to an indifferent, heedless and palpable violation of legal duty.

98.    NECC'S gross negligence included, but was not limited to, the following:

a) Failing to safeguard Lauren Ivison's frozen eggs.

b) Failing to properly label and store Lauren Ivison's frozen eggs.

c) Failing to implement strict safe and secure cryomanagement practices for the preservation of frozen eggs.

d) Failing to implement and follow strict safe and secure practices and protocols for handling and transporting frozen eggs.

e) Failing to ensure the secure transportation of frozen eggs from their facility to another facility under conditions and oversight that protected the viability of the frozen eggs.

f) Failing to provide for a system of identification to preserve the chain-of-custody of frozen eggs.

g) Failing to provide for a system to transport the oocytes from Extend to NECC and NECC/Extend to Conceptions, ensuring the necessary precautions were taken so that the oocytes would be property preserved.

h) Failing to promulgate rules and procedures for the proper handling and labeling of frozen eggs.

i) Misrepresenting the success rate of frozen egg survivability.

j) Relying on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

k) Failing to implement software and hardware technology to store, trace and maintain frozen eggs.

l) Failing to ensure that frozen eggs are only transferred to trained and qualified labs who can thaw eggs from Extend pursuant to the requisite specialized procedures.

m) Misrepresenting and falsely advertising the nature and quality of NECC's services and the terms and conditions on which services are performed.

n) Failing to warn Lauren of the dangers of egg transport.

99.    As a direct and proximate result of the gross negligence of NECC as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

100.   Plaintiff requests judgment against Defendant for a reasonable amount plus punitive damages, statutory interest and costs, and for such other relief as shall be appropriate.

## VIII.   FOURTH CAUSE OF ACTION - BREACH OF CONTRACT

101.   Plaintiff re-alleges each and every allegation of this Complaint.

102.   On behalf of itself and also acting as an agent of NECC, Extend entered a long-term storage contract with Lauren, making NECC an unnamed principal to the contract.

103.   NECC breached this contract by failing to provide the services as represented, making warranties and promises they could not or would not keep, as fully identified above in the factual allegations, included, but were not limited to, the following:

a)   Falsely representing NECC'S ability to safeguard Lauren Ivison's frozen eggs.

b)   Falsely representing frozen eggs could be safely transported to a long-term storage facility.

c)   Failing to disclose the material fact that NECC relied on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

d)   Failing to disclose the material fact that NECC had not implemented software and hardware technology to store, trace and maintain frozen eggs.

e)   Failing to disclose the material fact that Lauren's frozen eggs would not be safely stored.

f)   Misrepresenting and falsely advertising the nature and quality of NECC'S services and the terms and conditions on which services are performed.

104.   As a direct and proximate result of NECC'S breach of contract and express warranties as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

105.   Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

## IX.    FIFTH CAUSE OF ACTION - BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)

106.    Plaintiff re-alleges each and every allegation of this Complaint.

107.    NECC and Extend entered into a contract governing NECC's provision of storage and transport services to Extend clients.

108.    The contract between NECC and Extend was intended to benefit clients retrieving eggs with the intention of storing them and using them at a later date.  Lauren is one of the clients that the NECC-Extend contract was intended to benefit.

109.    NECC breached this contract by failing to provide the services as represented, making warranties and promises they could not or would not keep, as fully identified above in the factual allegations, included, but were not limited to, the following:

g)  Falsely representing NECC'S ability to safeguard frozen eggs.

h)  Falsely representing NECC'S cryomanagement services for the preservation and use of frozen eggs.

i)  Falsely representing NECC'S cryomanagement services for handling and transport of frozen eggs.

j)  Falsely representing NECC'S maintained a secure system of identification to preserve the chain-of-custody of frozen eggs.

k)  Falsely representing NECC'S services included providing for a safe system to transport the oocytes from Extend to another lab that ensured the necessary precautions were taken so that the oocytes would be property preserved.

l)  Falsely representing NECC maintained precautions necessary to ensure Lauren's frozen eggs were preserved during transport to Conceptions.

m) Falsely representing frozen eggs could be safely and securely transported to another laboratory for thawing.

n)  Failing to disclose the material fact that NECC relied on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

o)  Failing to disclose the material fact that NECC had not implemented software and hardware technology to store, trace and maintain frozen eggs.

p) Misrepresenting and falsely advertising the nature and quality of NECC'S services and the terms and conditions on which services are performed.

110.   As a direct and proximate result of NECC'S breach of contract and express warranties as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

111.   Plaintiff requests judgment against NECC for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

## X.   SIXTH CAUSE OF ACTION - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

112.   Plaintiff re-alleges each and every allegation of this Complaint.

113.   NECC had a duty to the Plaintiff to exercise reasonable care in their representations, marketing, supply, sale, and provision of its products and services. NECC breached this duty as described above and the breach of that duty constituted a proximate cause of Plaintiff's injuries.

114.   Specifically, Plaintiff suffered emotional distress as a result of NECC's breach, which resulted in physical harm manifested by objective symptomology.

115.   NECC's reckless actions would have caused a reasonable person, like Plaintiff, to suffer emotional distress under the circumstances.

## XI.   DAMAGES

116.   Based on the foregoing, Plaintiff demands judgment against NECC on each of the above-referenced claims and causes of action, for general and special damages, for the costs expended herein, and for such other and further relief, both at law and in equity, to which Plaintiff may show herself justly entitled, including, as follows:

a. Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action.

b. Compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss.

c. Economic damages in the form of medical expenses, out of pocket expenses, travel and transportation expenses, lost earnings and other economic damages in an amount to be determined at trial of this action.

d. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless actions of the NECC which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and to deter future similar conduct, to the extent allowed by applicable law.

e. Pre-judgment interest at the maximum rate allowed by law.

f. Post-judgment interest at the maximum rate allowed by law.

g. Such other and further relief as this Court deems just and proper.

## XII.   **DEMAND FOR JURY TRIAL**

117.    Plaintiff hereby demands a trial by jury as to all issues.

## XIII.   **PRAYER**

118.    Based on the foregoing, Plaintiff demands judgment against NECC for general damages, special damages, for the costs expended herein, for prejudgment interest from the date of the injury through judgment, and post-judgment interest on the judgement at the maximum rate allowed by law, and for such other and further relief, both at law and in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,
The Plaintiff,
By her attorneys,

Dated: 05/25/2023

Michael C. Shepard
BBO No. 567842
Erika A. O'Donnell
BBO No. 661534
Michael J. McCann
BBO No. 690542
Giuliana D'Esopo
BBO No. 706138
Kelsey McCandless
B.B.O. No. 711403
Shepard O'Donnell P.C.
160 Federal Street, 13th Floor
Boston, MA  02110
(617) 451-9191